# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NORTHEASTERN DIVISION

NORMA CAROLYN RANDOLPH,   )
   )
     Plaintiff,   )
   )   **Civil Action No. 2:05-0123**
   v.   )   **Judge Nixon / Knowles**
   )
MICHAEL J. ASTRUE,   )
Commissioner of Social Security,   )
   )
     Defendant.   )

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Commissioner of Social Security which found that Plaintiff was not disabled and which denied Plaintiff Disability Insurance Benefits ("DIB"), as provided under Title II of the Social Security Act ("the Act"). The case is currently pending on Plaintiff's Motion for Judgment on the Administrative Record. Docket Entry No. 8. Defendant has filed a Response, arguing that the decision of the Commissioner was supported by substantial evidence and should be affirmed. Docket Entry No. 12.

For the reasons stated below, the undersigned recommends that Plaintiff's Motion for Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner be AFFIRMED.

1

## I. INTRODUCTION

Plaintiff filed her application for Disability Insurance Benefits on November 29, 2001, alleging that she had been disabled since November 27, 2001, due to polycystic kidney disease, fibromyalgia, high blood pressure, recurring pain, and fatigue. *See, e.g.,* Docket Entry No. 6, Attachment ("TR"), pp. 52, 65. Plaintiff's application was denied both initially (TR 31-32) and upon reconsideration (TR 33-34). Plaintiff subsequently requested (TR 42) and received (TR 24-27) a hearing. Plaintiff's hearing was conducted on March 17, 2004, by Administrative Law Judge ("ALJ") William F. Taylor. TR 503. Plaintiff and Vocational Expert, Dr. Kenneth Anchor, appeared and testified. TR 503-504.

On May 20, 2004, the ALJ issued a decision unfavorable to Plaintiff, finding that Plaintiff was not disabled within the meaning of the Social Security Act and Regulations. TR 15-23. Specifically, the ALJ made the following findings of fact:

1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. The claimant's fibromyalgia is considered "severe" based on the requirements in the Regulations 20 CFR § 404.152(c).

4. This medically determinable impairment does not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

2

6. The claimant retains the residual functional capacity for a wide range of sedentary work requiring that she lift and carry no more than 10 pounds. She can stand/walk for at least two out of eight hours and sit for six out of eight hours. She can occasionally balance, but never climb, kneel, crouch or crawl. Environmental limitations include the need to avoid extreme heat and cold and the need to avoid cigarette smoke. She has no limitation in manipulative functions such as reaching, handling, fingering and feeling.

7. The claimant's past relevant work as parts inspector did not require the performance of work-related activities precluded by her residual functional capacity (20 CFR § 404.1565).

8. The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 CFR § 404.1520(f)).

TR 22-23.

On June 24, 2004, Plaintiff timely filed a request for review of the hearing decision. TR 13. On November 2, 2005, the Appeals Council issued a letter declining to review the case (TR 6-9), thereby rendering the decision of the ALJ the final decision of the Commissioner. This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. § 405(g). If the Commissioner's findings are supported by substantial evidence, based upon the record as a whole, then these findings are conclusive. *Id.*

## II.  REVIEW OF THE RECORD

### A.  Medical Evidence

Plaintiff alleges disability due to polycystic kidney disease, fibromyalgia, high blood pressure, recurring pain, and fatigue. TR 65.

On July 18, 1996, Dr. Ronald E. Overfield performed a mammogram on Plaintiff that revealed "a few small, benign-appearing nodular densities bilaterally." TR 157. A "renal ultrasound"

3

showed "enlarged kidneys with hypoechoic lesions bilaterally," that were consistent with polycystic disease. TR 153.

On October 17, 1996, Dr. Overfield noted "no significant abnormality" in Plaintiff's right elbow. TR 156.

On March 3, 1997, Plaintiff saw Dr. Chet M. Gentry for a check of her blood pressure. TR 270-271. Plaintiff weighed 165 pounds, and her blood pressure was 184/100. TR 270. Plaintiff's physical examination was normal. *Id.* Dr. Gentry noted Plaintiff's polycystic kidney disease. TR 272. Dr. Gentry diagnosed Plaintiff with hypertension and allergic rhinitis, and prescribed Guaifenesin, Zocor, Nadolol, Estratab, and Chlorpheniramine. TR 270-271.

On April 1, 1997, Plaintiff went to Dr. Gentry, complaining that "her fingers had turned white and felt 'dead.'" TR 269. Dr. Gentry noted "no evidence of Raynauds Phenomenon presently," but diagnosed Plaintiff with "probable Raynaud's Syndrome." *Id.* Laboratory tests performed on April 3, 1997 showed Plaintiff to have elevated levels of "ESRWINT," "C-RP," and "PSA."[1] TR 287, 308.

On July 28, 1997, Plaintiff weighed 162 pounds, and her blood pressure was 118/76.[2] TR 200. Plaintiff's blood pressure was noted to be "under very good control." *Id.* Plaintiff's examining physician noted neck, back, and abdominal pain. *Id.* Urinalysis demonstrated that Plaintiff's creatinine and cholesterol were elevated, and her "total bilirubin" and "ALK PHOS" were low. TR

---

[1] There is no physician's name on these records, but they are in the span of pages identified in the List of Exhibits as "Medical Records... from Chet Gentry, M.D." TR 3, 287, 308.

[2] The physician's signature is illegible. TR 200. This record is in the span of pages identified in the List of Exhibits as "Medical Records... from Heritage Medical Association." TR 3.

4

169. Also on July 28, 1997, Dr. Overfield performed Plaintiff's mammogram, which revealed "no significant interval change" when compared to her mammogram from July 18, 1996. TR 154.

On August 8, 1997, Plaintiff went to Dr. Gentry's office with sinus problems. TR 268. Plaintiff weighed 162 pounds and her blood pressure was 154/84. *Id.* Dr. Gentry diagnosed sinusitis and prescribed Azithromycin, Bidex, and Phenergan. *Id.*

On November 24, 1997, Plaintiff again went to Dr. Gentry's office with sinus problems. TR 267. Plaintiff weighed 167 pounds and her blood pressure was 152/84. *Id.* Dr. Gentry diagnosed sinusitis and prescribed Ceclor, Bidex, and Ezol. *Id.*

On January 6, 1998, Plaintiff returned to Dr. Gentry for a follow-up regarding her sinusitis and complaining of ear pain. TR 266. Dr. Gentry noted that Plaintiff had "had 2 infections in 12 months." *Id.* Plaintiff weighed 165 pounds and her blood pressure was 120/76. *Id.* Dr. Gentry diagnosed her with "chronic seros Otitis Media," resulting from sinusitis, and prescribed Medent LD and Tylenol. *Id.*

On May 6, 1998, Plaintiff saw Dr. Gentry with complaints of leg and feet cramping. TR 264-265. Plaintiff opined that it might be because of a low potassium level, but tests for low potassium were normal. TR 264, 286. Plaintiff returned to Dr. Gentry on May 15, 1998, reporting that the leg cramps "may be a little worse." TR 264. Dr. Gentry suggested that the cramps might be related to Plaintiff's polycystic kidney disease and prescribed a temporary dosage of Xanax. *Id.*

On June 12, 1998, Plaintiff saw Dr. Gentry, complaining of edema in her ankles, feet, hands, and face. TR 263. Plaintiff's laboratory tests returned normal results. TR 284-285.

5

On June 18, 1998, Plaintiff visited Dr. Hanson, complaining that she would sometimes "get so weak [that she could] hardly sit up."[3] TR 195. Plaintiff weighed 161 pounds, and her blood pressure was 134/72. *Id.* Plaintiff's physical examination indicated that she was "healthy." TR 194. Plaintiff's laboratory work revealed elevated creatinine levels and her urine showed "growth of normal skin flora." TR 164-166.

On August 6, 1998, Plaintiff went to Dr. Hanson with complaints of "generalized" swelling that was "worse at times."[4] TR 193. Plaintiff's laboratory tests revealed elevated levels of creatinine, cholesterol, and "LDL (CALC)," and low levels of "ALK PHOS." TR 162. Dr. Robert J. Stallworth performed a series of x-rays which indicated enlarged polycystic kidneys and cholelithiasis. TR 151. Dr. Stallworth also performed a mammogram, the results of which did not suggest malignancy. TR 152.

On November 5, 1998, Plaintiff saw Dr. Hanson for indigestion. TR 191. Plaintiff weighed 160 pounds and her blood pressure was 148/78. TR 191. Dr. Hanson noted that Plaintiff reported being fatigued, and having diarrhea, constipation, hemorrhoids, joint pain, and a change in her hearing. *Id.* Plaintiff's physical examination indicated that she was "healthy." TR 190.

On January 27, 1999, Plaintiff went to Dr. Gentry, complaining of lesions on her forehead. TR 262. Plaintiff weighed 164 pounds, and her blood pressure was 138/74. *Id.* On February 1, 1999, Plaintiff underwent a punch biopsy for diagnostic evaluation of the lesions. TR 261. On

---

[3]The physician's name is not fully legible. TR 195. The record is in the span of pages identified in the List of Exhibits as "Medical Records... from Heritage Medical Association." TR 3.

[4] Most of this record is illegible. TR 192-193.

6

February 2, 1999, Dr. George B. Sonnier examined the specimen from the biopsy, which indicated benign epithelial hyperplasia consistent with prurigo nodularis. TR 324.

On February 5, 1999, Plaintiff went to Dr. Hanson with complaints of fatigue.[5] TR 189. Her blood pressure was reported to be "fairly well controlled." TR 188. Plaintiff's laboratory tests indicated elevated levels of "ESR," "UREA nitrogen," creatinine, cholesterol, and "SGPT/ALT," but low levels of "ALK PHOS." TR 158, 178.

On May 13, 1999, Plaintiff visited Dr. Hanson, complaining of fatigue. TR 187. Plaintiff weighed 169 pounds, and her blood pressure was 122/80. *Id.* Laboratory tests revealed Plaintiff's creatinine, cholesterol, and "SGPT/ALT" levels to be elevated. TR 176. Dr. Hanson prescribed Zyrtec, Claritin, "OCC Phenylpropalme." TR 186.

On June 3, 1999, in response to Plaintiff's recurrent cold-like symptoms, Nurse Tara Masters at Dr. Gentry's office diagnosed Plaintiff with "URI," and prescribed a "Zpack," Medent, and Tylenol. TR 258-259. On June 14, 1999, Plaintiff's symptoms had continued, and Dr. Gentry diagnosed her with sinusitis and allergic rhinitis. TR 257. Plaintiff weighed 170 pounds, and her blood pressure was 130/84. *Id.*

On July 31, 1999, Dr. Gentry noted that Plaintiff had onychomycosis of the right toe, but remarked that there did not appear to be enough material there to be causing the toe pain of which Plaintiff complained. TR 256. The results of Plaintiff's urinalysis were negative, except for a "trace" of protein. *Id.* Dr. Gentry diagnosed Plaintiff with dysuria. *Id.*

---

[5] Most of this record is illegible. TR 188-189.

On August 12, 1999, Plaintiff went to Dr. Hanson with complaints of fatigue, increased blood pressure, and polycystic kidneys.[6] TR 185. Plaintiff weighed 164 pounds, and her blood pressure was 152/80. *Id.* Plaintiff underwent a mammogram, which Dr. Overfield reported as showing "no evidence of cancer." TR 421. Laboratory tests revealed that Plaintiff's creatinine and cholesterol were elevated, and her "ALK PHOS" was low. TR 175. Dr. Hanson remarked that Plaintiff's polycystic disease was stable, and her blood pressure was under "good control," although her estrogen control was only "borderline." TR 184.

On October 30, 1999, Plaintiff visited Dr. Gentry, complaining of headache, sinus drainage, ear pain, and congestion. TR 255-256. Plaintiff weighed 168 pounds, and her blood pressure was 120/70. *Id.* Dr. Gentry diagnosed Plaintiff with sinusitis and allergic rhinitis, and prescribed Rocephin, Depo Medrol, Claritin, Nasacort AQ, and Tylenol. *Id.*

On December 30, 1999, Dr. Gregory R. Weaver performed an "upper GI and esophagram" that revealed "no evidence of esophageal stenosis," "no radiographic evidence for esophagitis," and was "negative for active peptic ulcer disease." TR 147.

On February 28, 2000, Plaintiff visited Dr. Hanson, complaining of "face numbness." TR 181. Dr. Hanson noted that her descriptions generally belied "a classic migraine." TR 180-181. Plaintiff weighed 162 pounds, and her blood pressure was 112/72. *Id.* Plaintiff's cholesterol was elevated. TR 172. Laboratory tests performed for Dr. Lee Crowe indicated that Plaintiff had elevated levels of creatinine, "total" cholesterol, and "LDL cholesterol, CALC," and low levels of "creatinine clearance." TR 232.

---

[6] Two other complaints are illegible, as is much of this record. TR 184-185.

8

On March 9, 2000, Plaintiff visited Dr. Gentry, complaining of congestion, sinus pressure, and sore throat. TR 254. Plaintiff weighed 165 pounds, and her blood pressure was 122/72. *Id.* Dr. Gentry diagnosed Plaintiff with sinusitis, and prescribed a "Zpack" and Tylenol. *Id.*

On March 23, 2000, Plaintiff saw Dr. Crowe, complaining of dizziness, facial flushing, headache, nasal congestion, and numbness in her hands. TR 223. Dr. Crowe diagnosed Plaintiff with a "probable viral upper respiratory," polycystic kidney disease with mild renal insufficiency, and hypertension that was "well controlled." *Id.* He suggested that Plaintiff decrease her "HCTZ" and begin taking Furosemide. *Id.*

On May 3 and 5, 2000, Dr. Gentry treated Plaintiff for sinusitis and bronchitis. TR 252-254. On May 26, 2000, Dr. Gentry diagnosed Plaintiff with chronic sinusitis, and prescribed Rocephin, Ceclor, and Tylenol. TR 251-252. Plaintiff's sinus series revealed that her "paranasal sinuses and mastoid air cells are clear and well pneumatized." TR 323.

On June 1, 2000, Dr. Crowe noted that Plaintiff's hypertension was "well controlled." TR 222. Plaintiff weighed 163 pounds, and her blood pressure was 132/72. *Id.* Urine tests indicated that Plaintiff's creatinine level was elevated. TR 231.

On August 16, 2000, Nurse Deborah Hensley diagnosed Plaintiff with a urinary tract infection at Dr. Gentry's office, and prescribed Levaquin. TR 250-251. Plaintiff's urinalysis returned normal results. TR 283. Plaintiff weighed 164 pounds, and her blood pressure was 118/68. TR 251.

On September 14, 2000, Dr. Crowe noted that Plaintiff's hypertension remained "well controlled." TR 218. Plaintiff's urinalysis revealed trace leukocytes and "a rare red cell and a rare white cell." *Id.*

9

On September 20, 2000, Dr. Gentry noted that Planitiff was taking the following medications: Phenergan, Alprazolam, Claritin, Guaifenesin, Chlorpheniramine, Estratab, Hydrochlorthiazide, Nadalol, Zocor, Lotensin, Ezol, Darvon, Nasacort, and Sporanox. TR 250.

On September 26, 2000, Plaintiff went to Dr. Gentry complaining of vaginal dryness and was prescribed Premarin cream. TR 249. Plaintiff's urinalysis returned normal results. TR 282. Plaintiff was told to discontinue taking Lotensin to begin taking Diovan. TR 249. Plaintiff weighed 163 pounds, and her blood pressure was 120/74. *Id.*

On November 3, 2000, Dr. Gentry reported the results of a bone density test he had performed on Plaintiff on October 25, 2000. TR 419-420. Plaintiff's test on her spine and hip were both normal, making her "risk for a fracture due to osteoporosis... about the same as other people" like Plaintiff. TR 419.

On November 28, 2000, Dr. Crowe noted that Plaintiff reported that she often did not feel well, "but ha[d] no specific complaints." TR 217. Plaintiff's "total" cholesterol, "LDL-cholesterol," and creatinine were elevated. TR 228. Dr. Crowe instructed Plaintiff to continue taking her then-current medications. TR 217.

On December 7, 2000, Plaintiff went to Dr. Gentry's office with sinus drainage, weakness and numbness on the left side of her face, fatigue, and "a lot of stress." TR 245-246. Plaintiff weighed 161 pounds, and her blood pressure was 138/80. TR 245. Nurse Hensley referred Plaintiff for an MRI for her facial weakness, prescribed a "Zpak," Medent, and Tylenol, and ordered tests for her "enlarged thyroid" and fatigue. TR 246. Dr. Gary Militana performed Plaintiff's brain MRI, finding it "unremarkable." TR 319-320. Plaintiff's B12 and folate levels were normal. TR 279-280. Plaintiff's "T4TOT" on her "thyroid profile" was noted to be high. TR 281. On December 12, 2000,

Dr. Militana performed an "MRA Circle of Willis" on Plaintiff, finding it "unremarkable" as well. TR 319. A December 14, 2000 addendum to Dr. Gentry's report stated that Plaintiff's "thyroid profile, B12 and folate were all normal." TR 245.

On December 18, 2000, Plaintiff saw Dr. Brian Dockery for a follow-up examination regarding her polycystic kidney disease, hypertension, hyperlipidemia, and multiple cysts. TR 364. Plaintiff weighed 157 pounds, and her blood pressure was 140/74. *Id.* On December 19, 2000, Plaintiff reported "some numbness and tingling in the left side of the face," along with "mild drooping of the left eyelid as well as drooping of her mouth." TR 362. Dr. Dockery noted that Plaintiff did not drink alcohol or smoke cigarettes. *Id.* Plaintiff's physical examination was remarkable for "mild ptosis of the left eyelid" and "some mild decrease in sensation of the left side of the face." TR 363. Dr. Dockery did not make any changes to Plaintiff's treatment plan, except to discontinue Trazodone. *Id.* A "US ABD B scan" ordered by Dr. Dockery was completed on December 26, 2000, and revealed polycystic kidney disease "with no evidence of obstructive uropathy." TR 368.

On January 11, 2001, Dr. Daniel R. Lalonde saw Plaintiff upon a referral from Dr. Gentry. TR 312-313. Dr. Lalonde's examination "show[ed] that brainstem function and related cranial function is perfectly intact." TR 313. Dr. Lalonde agreed with Dr. Gentry's assessment that Plaintiff "likely had a mild" case of Bell's Palsy, determining that "the best thing to do would be to observe only." *Id.*

On February 7, 2001, Plaintiff saw Dr. Gentry, complaining of continued vaginal dryness and irritation. TR 243-244. Plaintiff weighed 163 pounds, and her blood pressure was 122/78. TR 243. Dr. Gentry diagnosed her with postmenopausal atrophic vaginitis, and prescribed Premarin

11

cream. TR 243-244. On February 13, 2001, Dr. Gentry added that Plaintiff's estradiol level was 76, opining that an increase in estrogen and a higher dosage of Estratab might relieve Plaintiff's symptoms. *Id.*

On February 16, 2001, Plaintiff went to Dr. Dockery, complaining of vaginal irritation, back pain, neck pain, and nausea. TR 361. Dr. Dockery diagnosed Plaintiff with atrophic vaginitis, vaginal candidiasis, and musculoskeletal back pain. *Id.* Dr. Dockery recommended "conservative measures" for Plaintiff's back pain. *Id.*

On March 19, 2001, Plaintiff began massage therapy at the Sandra Steele Memorial Massage Clinic ("Sandra Steele Clinic"). TR 467. Plaintiff reported that she frequently suffered from stress, had high blood pressure, had allergies, had broken a bone in her foot in the past two years, had been in an accident in the previous year, had tension or soreness, suffered from lower back pain, was "very sensitive" to touch or pressure in some areas, has had surgery, and had additional medical conditions and/or medications. TR 468. Plaintiff added that she took Atenol and Lotensin for her stress and high blood pressure and had polycystic kidney disease with two cysts in her liver. *Id.* Plaintiff underwent sessions twice per month in March, June, August, and October, and one more session in November of 2001. TR 467. On June 4, 2001, Plaintiff's massage therapist noted that Plaintiff reported that she "felt better" after her first two sessions, but her back remained tender. TR 470. From August 2001 through October 2001, Plaintiff continued to complain of a burning sensation in her shoulders and back. TR 471.

On March 29, 2001, Plaintiff saw Dr. Dockery, who noted that Plaintiff's vaginal infections were "doing better." TR 359. Plaintiff inquired about disability, and Dr. Dockery remarked that he "did not think [disability] was necessary on the basis of [Plaintiff's] kidney disease as she

12

remain[ed] quite functional." *Id.* Plaintiff refused Dr. Dockery's suggestion to increase her hypertension medication. *Id.* Dr. Dockery also recommended continued physical therapy for Plaintiff's neck pain. *Id.*

On May 5, 2001, Plaintiff went to Dr. Gentry, complaining of cough, congestion, sinus drainage, and headache caused by her "yearly allergies." TR 242. Plaintiff weighed 156 pounds, and her blood pressure was 138/74. *Id.* Dr. Gentry diagnosed Plaintiff with allergic rhinitis and insomnia, and he prescribed Allegra, "Tylenol or Motrin," and Ambien. *Id.*

On May 29, 2001, Plaintiff visited Dr. Crowe.[7] TR 214. Dr. Crowe noted that Plaintiff's hypertension was "well controlled." *Id.*

On June 27, 2001, Plaintiff visited Dr. Dockery for a follow-up regarding her left flank pain, stating that she believed that a "cyst ruptured," and complaining of "a burning sensation essentially all over her body," especially in her neck, shoulders, back, and hips. TR 358. Dr. Dockery diagnosed Plaintiff with polycystic kidney disease, peripheral neuropathy, and hypertension, and he opined, "I think she probably does have fibromyalgia." *Id.* Plaintiff had elevated levels of "alpha-1-globulins" and "c-reactive protein." TR 366.

On July 14, 2001, Plaintiff saw Dr. Gentry with complaints of ear pain, sinus, cough, congestion, runny nose, and drainage. TR 239-240. Plaintiff weighed 154 pounds, and her blood pressure was 122/78. TR 239. Dr. Gentry repeated the same assessment and recommendations as he had on May 5, 2001. TR 240.

On August 16, 2001, Plaintiff saw Dr. David S. Knapp with complaints of "a burning feeling up and down the spine and paraspinal muscles" and "pain in the lower back and hips not associated

---

[7] The reason for Plaintiff's visit is not stated in the record.

13

with numbness or tingling." TR 203-205. Dr. Knapp found Plaintiff's reports to indicate "a somewhat hectic and stressful lifestyle." TR 203. Plaintiff's laboratory results indicated that she was below the reference range for "RBC," "HCT," and carbon dioxide, and above for "BUN/creatinine ratio." TR 210-211. Dr. Knapp noted that Plaintiff had "many of the features of myofascial pain consistent with fibromyalgia syndrome," but he did "not suspect she [had] a systemic inflammatory rheumatic disease." TR 204. Dr. Knapp indicated that he had the impression that Dr. Dockery had "some concerns... regarding [a] diagnosis" of fibromyalgia. TR 205. Dr. Knapp recommended a trial of antidepressant and a home exercise video to supplement Plaintiff's massage therapy, and he administered  trigger point injections with Celestone in an attempt to relieve Plaintiff's pain. TR 204-205.

On September 4, 2001, Plaintiff visited Dr. Dockery "quite distraught" and "a little depressed," and complaining of insomnia, "diffuse sensations of her skin burning," and neck and back pain.  TR 357.  Plaintiff reported that her employer had been "giving her a hard time about missing work" and that she had been called to jury duty.  *Id.*  Dr. Dockery noted that Dr. Knapp had "agreed that [Plaintiff] did have fibromyalgia syndrome." *Id.*  Dr. Dockery diagnosed Plaintiff with fibromyalgia, prescribed Ambien and Zoloft, recommended that Plaintiff continue massage therapy, and enrolled Plaintiff in a fibromyalgia support group.  *Id.*

On September 19, 2001, Plaintiff went to Dr. Dockery for a follow-up regarding her polycystic kidney disease, chronic renal insufficiency, and fibromyalgia.  TR 356.  Dr. Dockery noted that Plaintiff appeared "in much better spirits" and that she had attended the fibromyalgia support group.  *Id.*  Plaintiff complained of diffuse sporadic pain in her chest, back, and abdomen,

14

a "burning sensation," and a "possible yeast infection." *Id.* Dr. Dockery diagnosed Plaintiff with fibromyalgia and hypertension, and noted that her chronic renal insufficiency was "stable." *Id.*

On October 13, 2001, Plaintiff went to Dr. Chad A. Griffin with complaints of "persistent nasal drainage," post nasal drip, and irritation in her right ear.[8] TR 236-237. Dr. Griffin diagnosed Plaintiff with "URI with sinusitis" and "otitis externa" on the right side, and prescribed a Zithromax pack, Cortisporin, Claritin, and fluids. *Id.*

On October 25, 2001, Plaintiff visited Dr. Dockery for a follow-up examination regarding her polycystic kidney disease, hypertension, hyperlipidemia, and fibromyalgia, and complaining of a "burning sensation in her skin" and trouble sleeping. TR 355. Plaintiff weighed 147 pounds, and her blood pressure was 130/80. Dr. Dockery continued Plaintiff's then-current medications, and encouraged Plaintiff to resume taking Zoloft. *Id.*

On November 10, 2001, Plaintiff went to Dr. Ty T. Webb, complaining of a cough, sputum, sinus drainage, and right ear ache.[9] TR 235-236. Dr. Webb diagnosed Plaintiff with acute sinusitis, and prescribed Celcor, Rhinocort, Tylenol, Zolpidem Tartrate, Rocephin, and Depo Medrol. TR 236.

On November 26, 2001, Dr. Crowe noted that Dr. Knapp had "apparently diagnosed fibromyalgia," but Dr. Crowe did not add that diagnosis to his diagnoses of polycystic kidney disease and "hypertension, not optimally controlled." TR 213. He prescribed Verapamil and gave Plaintiff samples of Covera and Nexium. *Id.*

---

[8] The record is in the span of pages given in the List of Exhibits as "Medical Records... from Chet Gentry, M.D.," but the signature on this record is "Dr. Griffin," who is apparently an associate of Dr. Gentry. TR 3, 236-237.

[9] The record is in the span of pages given in the List of Exhibits as "Medical Records... from Chet Gentry, M.D.," but the signature on this record is "Dr. Webb," who is apparently an associate of Dr. Gentry. TR 3, 236-237.

On December 29, 2001, Plaintiff complained to Dr. Griffin "of severe sinus pressure and pain in the region of her frontal sinuses" that "radiat[ed] down to her ears," as well as "some difficulty urinating along with some discomfort." TR 305-306. Plaintiff weighed 150 pounds, and her blood pressure was 166/90. TR 305. Plaintiff's urinalysis returned normal results. TR 276. Dr. Griffin diagnosed Plaintiff with sinusitis, dysuria and urinary hesitancy, hypertension that was "poor[ly] control[led]," generalized anxiety, and polycystic kidney disease, and he prescribed Cefzil, Zoloft, Norvasc, Lotensin, and Atenolol. TR 305-306.

On January 18, 2002, Plaintiff visited the Sandra Steele Clinic for a massage therapy session. TR 395. Plaintiff had massage therapy sessions twice in January and February, three times in March and April, twice in May, and once in June. *Id.* She did not have another session until September of 2002. *Id.* Plaintiff reported consistent discomfort in her back, shoulders, and hips, with the hip discomfort being mentioned most often throughout those six months. TR 471.

On January 21, 2002, Plaintiff underwent a mammogram, the results of which were normal. TR 353.

On February 8, 2002, DDS examiner Jeri L. Lee, Ed.D, conducted a clinical interview and mental status examination of Plaintiff, and also administered Plaintiff the Wide Range Achievement Test, Third Edition. TR 328-331. Dr. Lee considered Plaintiff "to be an accurate historian." *Id.* Dr. Lee found that Plaintiff's mood was "euthymic," her affect was "appropriate," she was "talkative," and her responses were "organized." TR 329. Plaintiff reported a variety of "depressive and anxiety symptoms" including, "being tense, worrying a lot, having headaches, sore muscles, back pain, neck pain, decreased appetite, weight loss, trouble falling asleep, waking in the middle of the night, feeling sad, having low energy, not being able to relax, not being able to concentrate, not enjoying

16

things like she used to and having trouble with her memory," all of which she attributed "to [her] medical problems and to her son's leaving home three years ago." *Id.* Dr. Lee opined that "adapting to change may be very difficult" for Plaintiff, who showed signs of "significant dependency traits." *Id.* Plaintiff reported that, on a "typical day," she would get up at 5:00 am and do housework, laundry, and cooking. TR 330. She further reported, however, that she "often goes a whole week without ever having a good day because 'there's pain all over,'" and that the pain made her want to "stay in bed" and "lay around a lot." *Id.* Plaintiff stated that she did "almost all the housework" (with her husband helping with the "heavy lifting chores"), and that she could manage money, drive a car, cook meals, dress and bathe herself, remember appointments, grocery shop, take care of children, get along with people, and "stick with tasks until they are completed." *Id.* Dr. Lee found Plaintiff "to be in the low average range" for intelligence, with no impairment in her abilities to understand and remember, sustain concentration and persistence, socially interact, and adapt. TR 330-331. Dr. Lee noted a then-current GAF of 75, with a past GAF of 79 for Plaintiff. TR 331.

On February 14, 2002, Plaintiff was admitted to the emergency department of Cookeville Regional Medical Center. TR 334-347. Records indicate that Plaintiff was "disoriented" with "memory loss" and pain between the shoulders and in the lower back.[10] TR 334. Plaintiff underwent a chest radiograph and CT scan of her head, the results of which were normal. TR 346-347. Later that day, nurses noted that Plaintiff was "alert" and "fully oriented to place" with "no recollection of some events of last nite [*sic*] & early today." TR 336.

On February 15, 2002, Dr. Randolph Robertson performed a bilateral "US carotid," per Dr. Dockery's request. TR 351. Plaintiff's ultrasound revealed a "very small amount of plaque in both

---

[10] The nurses' signatures are illegible. TR 334.

17

carotid bulbs causing less than 5% luminal narrowing," but was otherwise unremarkable. *Id.* Plaintiff's "MR scan of the brain" appeared normal. TR 352.

On February 18, 2002, Plaintiff visited Dr. Dockery for a follow-up regarding her emergency room visit. TR 349. Dr. Dockery diagnosed Plaintiff with hypertension, chronic renal insufficiency, fibromyalgia, and an "episode of aphasia," and noted that Plaintiff "has had no witnessed seizure activity." *Id.* Dr. Dockery added that Plaintiff remained unable to work because of her "severe" fibromyalgia symptoms. *Id.* Plaintiff's laboratory tests revealed elevated levels of glucose and creatinine, and low levels of carbon dioxide. TR 350.

On February 26, 2002, upon referral from Dr. Dockery, Dr. Daniel Donovan wrote a "Consultation Note" regarding Plaintiff. TR 448-450. Dr. Donovan noted that Plaintiff had a "generally benign" neurological history, with "occasional headaches" and "possible confusion spells with bright and flashing lights." TR 448. Plaintiff's physical examination revealed normal results. *Id.* Dr. Donovan found that Plaintiff's brain MRI was normal except for "one FLAIR weighted image" suggestive of "an asymmetry of signal intensity in the lower medulla." TR 449. Dr. Donovan believed that Plaintiff's "spells," including the one leading to her hospital visit on February 14, 2002, suggested "transient global amnesia." *Id.* Dr. Donovan also diagnosed Plaintiff with fibromyalgia, "what may well be an atypical depression," "chronic renal insufficiency," polycystic kidney disease, and hypertension, and he ordered an EEG and myasthenia gravis profile. *Id.*

Also on February 26, 2002, DDS medical consultant, Dr. Jas P. Lester found that Plaintiff's physical impairments were "not severe, singly or combined." TR 371. Dr. Lester noted that Plaintiff was "mildly overweight" with "benign HVD without EOD" and he also stated

18

"unremarkable RA consult." *Id.* He further noted that Plaintiff was "found to have polycystic kidneys, well compensated renal function on RX, and no ME for a significant GI imp't." *Id.*

On March 1, 2002, Plaintiff's Psychiatric Review Technique form indicated that the evaluator found Plaintiff to have "no medically determinable" mental impairment.[11] TR 372. The remainder of the form was left blank, as inapplicable. TR 373-385.

On March 21, 2002, Dr. Donovan noted that Plaintiff's EEG showed "no evidence of seizure activity." TR 447. Dr. Donovan also noted that Plaintiff's blood pressure had dropped to 104/68 following her "recent adjustment in her blood pressure medication." *Id.* On March 26, 2002, Dr. Robertson performed an "MR brain" ordered by Dr. Donovan, which yielded normal results. TR 451.

On April 12, 2002, Physical Therapist Todd R. Burks conducted a Functional Capacity Evaluation regarding Plaintiff. TR 396-401. Mr. Burks noted some degree of limitation for Plaintiff in kneeling, climbing stairs, crawling, sitting, standing, walking, reaching forward and overhead, balancing, controlling her arms and legs, lifting, carrying, and pushing and pulling. TR 397. Mr. Burks also noted that Plaintiff's "specific acceptable Leg Lift capability was 15.0 lb" and her "Torso Lift capability was 15.0 lb." TR 396. Mr. Burks reported that Plaintiff's average pain was "moderate," with a score of 4.5 out of 10. TR 398. Mr. Burks noted that Plaintiff gave "fair effort," indicating "valid results," and he opined that, by DOT standards, Plaintiff could "work at the sedentary-light" level "for an 8 hour day." TR 396.

On April 23, 2002, Plaintiff returned to Dr. Donovan, reporting "modest" improvement and having "more good than bad days" with "no further amnestic spells." TR 446. Plaintiff reported

_____

[11] The evaluator's signature is illegible. TR 372.

19

fatigue and trouble sleeping at night, in part caused by "burning and tingling all over." *Id.* Dr. Donovan continued Plaintiff's Ambien, increased her Zoloft, and prescribed Neurontin. *Id.*

Also on April 23, 2002, Dr. Dockery completed a Medical Source Statement of Ability to do Work-Related Activities (Physical) form regarding Plaintiff. TR 409-411. Dr. Dockery opined that Plaintiff could occasionally lift and/or carry ten pounds, frequently lift and/or carry less than ten pounds, stand and/or walk at least two hours in an eight-hour period, and sit about six hours in an eight-hour period. TR 409-410. Dr. Dockery found Plaintiff to be limited in pushing and/or pulling in both upper and lower extremities, adding that Plaintiff could infrequently push and/or pull twenty-five pounds, occasionally push and/or pull twenty pounds, and frequently push and/or pull ten pounds. TR 410. Dr. Dockery noted that Plaintiff would have to "periodically alternate sitting and standing to relieve pain or discomfort." *Id.* Dr. Dockery noted Plaintiff's only postural limitation was to be occasionally limited in balancing, and found Plaintiff unlimited in manipulation, vision, and communication. TR 410-411. Dr. Dockery recommended that Plaintiff "avoid even moderate exposure" to extreme temperatures. TR 411.

On May 7, 2002, Plaintiff returned to Dr. Dockery for a follow-up examination. TR 435. She weighed 147 pounds, and her blood pressure was 112/70. *Id.* Dr. Dockery decreased Plaintiff's Lotensin, recommended continuing "supportive therapy" for fibromyalgia, and recommended continuing care under Dr. Donovan for her "amnesic episodes." *Id.*

On May 21, 2002, Dr. Dockery opined that Plaintiff was "totally and permanently disabled" as a result of her fibromyalgia, chronic fatigue, and polycystic kidney disease. TR 412.

On May 23, 2002, Plaintiff saw Dr. Crowe for a variety of complaints, including polycystic kidney disease, hypertension, elevated cholesterol, fibromyalgia, headaches, neck stiffness, burning

shoulders, and fatigue. TR 459. Blood tests revealed Plaintiff to have elevated levels of glucose and creatinine, but low levels of sodium and chloride. TR 462. Dr. Crowe diagnosed Plaintiff with systolic hypertension, and recommended that she take Hydrochlorothiazide three times per week. TR 459.

On June 18, 2002, Dr. Evelyn Davis completed a Physical Residual Functional Capacity Assessment form regarding Plaintiff. TR 387-394. Dr. Davis opined that Plaintiff was capable of occasionally lifting and/or carrying fifty pounds, frequently lifting and/or carrying twenty-five pounds, standing and/or walking about six hours in an eight-hour period, and sitting about six hours in an eight-hour period. TR 388. Dr. Davis further opined that Plaintiff was unlimited in her ability to push and/or pull, and that she did not have any postural, manipulative, visual, communicative, or environmental limitations. TR 388-391.

On June 19, 2002, Plaintiff saw Dr. Dockery, complaining of "burning pain" that was "consistent with the fibromyalgic pain that she has had for some time." TR 414. A series of tests indicated that Plaintiff had elevated levels of triglycerides, total cholesterol, "LDL-cholesterol," and creatinine, but low levels of sodium, chloride, red blood cell count, hemoglobin, hematocrit, and "MPV." TR 406. Dr. Dockery noted that Plaintiff's blood pressure was under "fairly good control," and he prescribed Elavil. TR 414.

On June 24, 2002, Plaintiff returned to Dr. Donovan "brighter" and "physically much better." TR 445. Plaintiff reported "less confusion and improved memory over the past two months." *Id.* Plaintiff also reported that "her fatigue and discomfort are much improved when she obtains a full night's sleep." *Id.* Dr. Donovan prescribed Zoloft and Ambien, and found Plaintiff to be "functioning stably." *Id.*

21

On August 12, 2002, Dr. Audrey Tolbert noted that Plaintiff's blood pressure was "under current good control" and that Elavil had helped "somewhat." TR 413. A series of laboratory tests showed Plaintiff to have elevated levels of total cholesterol, "LDL-cholesterol," and creatinine, but low levels of hemoglobin, hematocrit, and "MPV." TR 403.

On September 27, 2002, Plaintiff went to the Sandra Steele Clinic for a massage therapy session. TR 395.

On November 8, 2002, Plaintiff visited the Sandra Steele Clinic for another massage therapy session. TR 395. Plaintiff returned for another massage therapy session later in November, and twice in December. *Id.* Plaintiff reported continued pain in her back, shoulders, and hips, but also reported sporadic relief and feeling "better" at the last three appointments of the year. TR 471-472.

On November 21, 2002, Plaintiff saw Dr. Crowe, complaining of weight gain, depression, insomnia, "little or no energy," "a lot of aches and pains in her neck, shoulders, and back," and "some flank pain." TR 458. Plaintiff was then-taking Zoloft, Amitriptyline, Ambien, Lotensin, Atenolol, "HCTZ," Premarin, Lipitor, Aciphex, and Potassium. *Id.* Plaintiff weighed 180 pounds, and her blood pressure was 142/96. *Id.* Plaintiff's physical examination was normal, except for obesity.[12] *Id.* Laboratory tests indicated that Plaintiff had elevated levels of "UREA nitrogen (BUN)" and creatinine. TR 461. Plaintiff's "bilateral US renal" examination on December 3, 2002, revealed polycystic kidney disease. TR 460.

On December 18, 2002, Plaintiff saw Dr. Tolbert for complaints of insomnia and for a physical examination. TR 434. Dr. Tolbert noted that Plaintiff was asking for more Ambien before she should have run out. *Id.* Plaintiff said she would "try to abide by [Dr. Tolbert's] rules" with

---

[12] The second page of this examination is not included in the record. TR 458.

regard to her use of painkillers and sleep aids. *Id.* Plaintiff weighed 178 pounds, and her blood pressure was 152/72. *Id.* Laboratory tests indicated that Plaintiff's glucose and creatinine levels were elevated, and her "MPV" was low. TR 443. Dr. Tolbert attributed Plaintiff's weight gain largely to her retirement and "being home all the time." *Id.*

On January 6, 2003, Plaintiff visited the Sandra Steele Clinic for a massage therapy session. TR 395. Plaintiff had regular appointments throughout the year, going more than two weeks between appointments only once, in August. TR 467. Plaintiff complained mainly of stiffness and tenderness in her hips, back, neck, and shoulders, with a primary focus on the pain in her hips. TR 472-473.

On January 7, 2003, Plaintiff saw Dr. Tolbert for a routine checkup, weighing 163 pounds, and having a blood pressure of 152/80. TR 433. Plaintiff's physical examination presented normal results. *Id.*

On February 4, 2003, Plaintiff underwent a mammogram ordered by Dr. Tolbert. TR 437. Plaintiff's mammogram showed "no mammographic evidence of malignancy" and "no detrimental change when compared to 1/21/02." *Id.*

On February 19, 2003, Plaintiff returned to Dr. Tolbert, complaining of a sore elbow and difficulty sleeping. TR 432. Plaintiff reported that she was feeling "somewhat better with her fibromyalgia." *Id.* Dr. Tolbert diagnosed her with tennis elbow, but did not prescribe anti-inflammatory medicines because of her chronic renal insufficiency. *Id.*

On March 6, 2003, Plaintiff visited Dr. Tolbert, reporting insomnia caused by her pain. TR 431. Dr. Tolbert noted "tightness in [Plaintiff's] paraspinous muscles in her back and upper trapezius muscles," prescribed Soma, and increased her Zoloft. *Id.* Laboratory tests indicated that Plaintiff's

23

"UREA nitrogen (BUN)" and creatinine levels were elevated, and her carbon dioxide levels were low. TR 442.

On April 4, 2003, Plaintiff reported to Dr. Tolbert that she was "sore all the time," that she slept "1-2 hours @ a time," and that she "wakes often thru the night." TR 431.

On May 22, 2003, Plaintiff saw Dr. Crowe, who noted that Plaintiff had polycystic kidney disease, hypertension, elevated cholesterol, fibromyalgia, and "frequently just does not feel good." TR 457. Plaintiff complained that she did not "have any energy and [did not] feel well," and that she had "some tingling in her hands but none in her feet." *Id.* Dr. Crowe noted that Plaintiff's weight had decreased to 164 pounds, and her blood pressure was 148/90. *Id.* Plaintiff's glucose and creatinine levels were elevated, while her carbon dioxide level was low. TR 441. Dr. Crowe diagnosed Plaintiff with hypertension that was "not optimally controlled," "chronic renal insufficiency due to polycystic kidney disease," and fatigue "possibly related to anemia." TR 457. Dr. Crowe recommended increasing her dosage of Lotensin, and terminating her use of Atenolol. *Id.*

On July 1, 2003, Plaintiff visited Dr. Tolbert for a recheck regarding her fibromyalgia. TR 430. Dr. Tolbert noted that Plaintiff had lost weight on the Topamax. *Id.* Dr. Tolbert made no changes to the treatment plan. *Id.* A check of Plaintiff's lipids showed her to have elevated levels of triglycerides, total cholesterol and "LDL-cholesterol." TR 440.

On July 21, 2003, Plaintiff complained of fatigue, and Dr. Tolbert found Plaintiff to have no "pain to palpation anywhere." TR 429. Dr. Tolbert recommended running a series of laboratory tests and prescribed Percocet, Vioxx, and Soma. *Id.*

24

On August 13, 2003, Plaintiff visited Dr. Tolbert for a recheck of her polycystic kidney disease, chronic insomnia, blood pressure, and lipids, and complaining of "quite a bit of fibromyalgia pain." TR 427. When told that she could not continue taking both medications, Plaintiff chose to stop taking Ambien and to continue to take Librium. *Id.* Plaintiff underwent an "XR esophagus-barium swallow," which revealed a "small sliding type hiatal hernia without reflux," but was otherwise "unremarkable." TR 436. Dr. Tolbert wrote a letter regarding Plaintiff, noting that Plaintiff suffered from "fairly severe fibromyalgia, chronic pain, chronic insomnia, chronic renal insufficiency with a creatinine in the 2's, polycystic kidney disease, hypertension and hyperlipidemia." TR 424. Dr. Tolbert reported that Plaintiff took Tomamax, Darvocet, muscle relaxers, and Librium, had "difficulty really doing any long-term tasks due to the pain," experienced "tiredness and fatigue symptoms," was "not dialysis dependent," had "some abdominal pain," had "an occasional cyst that ruptures and causes pain which puts her out of work," and had "problems with sleeping" which exacerbated her fatigue. *Id.*

On November 13, 2003, Plaintiff had a follow-up examination with Dr. Tolbert. TR 426. Laboratory tests revealed that Plaintiff had elevated levels of triglycerides, total cholesterol, "LDL-cholesterol," "UREA nitrogen (BUN)," and creatinine, while her "MPV" was low. TR 438. Noting that Plaintiff's weight had decreased to 140 pounds, and her blood pressure was 132/60, Dr. Tolbert decreased her Lotensin and increased her dosage of Librium. TR 426.

On November 24, 2003, Dr. Tolbert noted that Plaintiff was "feeling fairly well," but had been "depressed" and "not eating well." TR 425. She noted that Plaintiff had lost approximately twenty pounds since her previous visit. *Id.* Dr. Tolbert observed that Plaintiff's hypertension was "much lower since her weight loss." *Id.*

On January 7, 2004, Plaintiff visited the Sandra Steele Clinic for her massage therapy session. TR 467. She had three other appointments in January, four appointments in February, and one appointment in March of that year. *Id.* Plaintiff's main complaints were about pain her hips and right shoulder. TR 473-474. Plaintiff reported being very tired at two of her last three appointments, noting on her last appointment on March 3, 2004, that her mother had died. TR 474.

On February 13, 2004, Plaintiff saw Dr. Tolbert for a recheck regarding her fibromyalgia, polycystic kidney disease, and hypertension. TR 465. Dr. Tolbert noted that Plaintiff's weight had decreased from 173 to 135 pounds. *Id.* Dr. Tolbert continued Plaintiff on Zoloft, increased her Librium, and decreased her Lotensin. *Id.*

On March 2, 2004, Dr. Crowe completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) form regarding Plaintiff. TR 454-456. Dr. Crowe opined that Plaintiff was capable of occasionally lifting and/or carrying ten pounds, frequently lifting and/or carrying less than ten pounds, and standing and/or walking at least two hours in an eight-hour period, noting that "depression also impacts job performance." TR 454. Dr. Crowe further opined that Plaintiff's ability to sit was unaffected by her impairments, but that she would be required to alternate periods of sitting and standing to relieve pain or discomfort. TR 455. He found that Plaintiff was limited in both her upper and lower extremities in pushing and pulling in that she was unable to push or pull "heavy objects," but he added that "levers or pedals [would] not [be] a problem." *Id.* He also found that Plaintiff did not have any manipulative, visual or communicative limitations. TR 456. Dr. Crowe opined that Plaintiff would be incapable of jobs with a moderate or higher level of stress, but that she would be capable of performing low stress jobs. TR 455. He further opined that Plaintiff would need two unscheduled breaks per workday, and would need leg elevation while sitting. *Id.*

26

Dr. Crowe opined that Plaintiff would be absent from work twice per month as a result of her depression. *Id.* Dr. Crowe believed that Plaintiff's pain was "seldom" severe enough to interfere with attention and concentration, but that her history of depression would be "likely to produce good days and bad days." *Id.* Dr. Crowe found that Plaintiff could occasionally balance, kneel, and crouch, but could never climb or crawl. *Id.* Dr. Crowe opined that Plaintiff should "avoid all exposure" to cigarette smoke, "avoid even moderate exposure" to hazards such as machinery and heights, and "avoid concentrated exposure" to extreme temperatures, dusts, humidity, fumes, and chemicals. TR 456.

### B.  Plaintiff's Testimony

Plaintiff was born on September 14, 1947, and has a high school education.  TR 52, 506. Plaintiff testified that she could read and write English and add and subtract. TR 506.

Plaintiff stated that she had not worked since November of 2001. TR 507. Plaintiff reported that her job then was as a "wire lamp inspector" at Wagner Lighting. *Id.* Plaintiff stated that her job at Wagner Lighting involved frequent and "repetitive" use of her arms and hands. TR 508-509. Plaintiff reported that she had held that job for "27 and a half years," but that she quit because of "the fibromyalgia and... the polycystic kidney disease and the fatigue and the pain." TR 509-510. Plaintiff added that there were "a lot of nights that [she] couldn't sleep at all." TR 510. Plaintiff testified that she had collected six months of sick pay after she stopped working at that job. TR 507.

Plaintiff reported that she had known about her polycystic kidney disease for thirty-one years, but that it had "progressed" in that the cysts had grown "larger than what they were." TR 510. Plaintiff stated that she had to "watch" her blood pressure. *Id.* Plaintiff added that her fatigue came from the polycystic kidney disease, as well as from the fibromyalgia, leaving her with no "energy

to do anything." *Id.* Plaintiff testified that the polycystic kidney disease frequently led to abdominal pain, sometimes on a daily basis. *Id.* Plaintiff reported that a cyst would usually "burst" if she "lift[ed] anything real heavy." *Id.* Plaintiff stated that the pain caused by a bursting cyst would "put [her] out of work for a week, at least." *Id.* Plaintiff described the pain from the polycystic kidney disease as "real bad," even when it was not due to a bursting cyst. TR 511. Plaintiff testified that she developed fibromyalgia "two and a half years ago." *Id.* Plaintiff said it caused her to "ache and hurt all over" and made "the tender points... real sore." TR 512.

Plaintiff reported that her blood pressure was under good control, but that there were "times where it [would go] up." TR 513. Plaintiff testified that she did not have any problems with dizziness. *Id.* Plaintiff stated that she had "some tingling in [her] hands," although it did not hinder her use of them. TR 514. Plaintiff reported that she could only stand "maybe 30 minutes at a time" as a result of her fatigue and pain. *Id.* Plaintiff stated that she could only sit for "probably 30, 45 minutes" because of the pain in her back and legs. TR 514-515. Plaintiff testified that she would lie down often, "some mornings [not getting] up until 9:00 or 10:00," and then lying "back down about 2:00... for a couple hours" because of fatigue. TR 515. Plaintiff reported that the pain from her fibromyalgia and polycystic kidney disease would cause her to forget things and hinder her ability to write. TR 515-516. Plaintiff testified that she had a "TIA" on February 14th, she guessed, of "2001," but she also testified that she "believed it was after" she quit working.[13] TR 516. Plaintiff reported that memory problems sometimes led to her believing she was "having another one," but she did not think that she had any residual weakness from it. *Id.*

_____

[13]The Court believes that "TIA" stands for "Transient Ischemic Attack,"and notes that Plaintiff's visit to the Cookeville Regional Medical Center's emergency department for disorientation and memory loss occurred on February 14, 2002.

Plaintiff reported that she did the laundry and "sometimes" did the dishes, but that her husband did most of the cooking because she would have to sit down halfway through preparing a meal. TR 516. Plaintiff stated that she did not mop or do yard work, but "occasionally" vacuumed. *Id.* Plaintiff added that she did the grocery shopping, but would have to lie down after putting the groceries away. TR 517. Plaintiff testified that she did not do any activities outdoors. *Id.* Plaintiff reported that she attended church, made scrap books, and read, adding that she had no problems with personal care, including bathing and getting dressed. *Id.* Plaintiff stated that she had a driver's license and was able to drive. TR 506. Plaintiff stated that she could drive about "12 miles" at a time. TR 518. Plaintiff reported that she had problems with fatigue from the moment she woke up, that it usually did not get better during the day, and that it sometimes got worse. TR 512. Plaintiff testified that there were "a few days" when she did not have problems with fatigue. TR 512-513. Plaintiff reported that she did not "sleep a lot of the nights." TR 513. Plaintiff stated that sleep medication from Dr. Tolbert helped her "sleep some, but [she did not] sleep a whole night through." *Id.*

Plaintiff stated that she switched from Dr. Dockery to his wife, Dr. Tolbert, because Dr. Dockery "went into a different practice." TR 511. Plaintiff testified that Dr. Dockery sent her to Dr. Knapp, a "rheumatologist," and that Dr. Crowe was her "treating doctor" on her kidney condition. TR 511-512. Plaintiff reported that she did not smoke tobacco, drink alcohol, or use any "street drugs" such as cocaine or marijuana. TR 506.

### C.  Vocational Testimony

Vocational Expert ("VE"), Dr. Kenneth Anchor, also testified at Plaintiff's hearing.  TR 507-509, 518-520.  With regard to Plaintiff's past relevant work history, the VE stated that Plaintiff's

only "vocationally relevant" work in the past fifteen years was as a "parts inspector," which he classified as sedentary and semiskilled since "the majority of [Plaintiff's] day was spent sitting down," and the items handled by Plaintiff were "much less than ten pounds." TR 508-509.

The ALJ presented the VE with a hypothetical situation paralleling that of Plaintiff and asked if the hypothetical claimant would be able to do any of the work that Plaintiff had done in the past. TR 518-519. The VE answered that the hypothetical claimant could perform her past relevant work. TR 519.

Plaintiff's counsel then modified the hypothetical posed by the ALJ to include a sit/stand option, a requirement that Plaintiff's legs be elevated, and a requirement that Plaintiff would "sleep at least two days and not work." TR 519-520. The VE testified that requiring a sit/stand option would not preclude Plaintiff's past relevant work. TR 520. The VE further testified that Plaintiff's past relevant work would not be precluded if she had to elevate her legs on a foot stool, but would be precluded if she had to elevate "them at waist level or higher or repeated periods during the day." *Id.* The VE also testified that Plaintiff's need to "sleep at least two days and not work" would not preclude her past relevant work if she had to miss only "one or two days or no days" per month. *Id.*

Plaintiff's counsel again modified the hypothetical to include only occasional use of her arms and hands. TR 520. The VE testified that the hypothetical claimant would be precluded from Plaintiff's past relevant work if she "were restricted to only to [*sic*] occasional use of her arms and hands," which he defined as "less than a third of the day using the upper extremities." *Id.* Finally, Plaintiff's counsel added the limitation of "fatigue and pain to the degree that she were required to lie down at least two hours in an eight-hour work day." *Id.* The VE testified that Plaintiff's past

30

relevant work would be precluded if she had "to be lying down two hours a day during the work day." *Id.*

### III. CONCLUSIONS OF LAW

#### A. Standards of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "Substantial evidence" has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner,* 105 F.3d 244, 245 (6th Cir. 1996) (*citing Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

The reviewing court does not substitute its findings of fact for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). If the Commissioner, however, did not consider the record as a whole, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985) (*citing Allen v.*

Case 2:05-cv-00123   Document 13   Filed 08/27/07   Page 31 of 40 PageID #: 77

*Califano,* 613 F.2d 139, 145 (6th Cir. 1980) (*citing Futernick v. Richardson,* 484 F.2d 647 (6th Cir. 1973))).

In reviewing the decisions of the Commissioner, courts look to four types of evidence:  (1) objective medical findings regarding Plaintiff's condition; (2) diagnosis and opinions of medical experts; (3) subjective evidence of Plaintiff's condition; and (4) Plaintiff's age, education, and work experience.  *Miracle v. Celebrezze*, 351 F.2d 361, 374 (6th Cir. 1965).

### B.  Proceedings At The Administrative Level

The claimant carries the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  "Substantial gainful activity" not only includes previous work performed by Plaintiff, but also, considering Plaintiff's age, education, and work experience, any other relevant work that exists in the national economy in significant numbers regardless of whether such work exists in the immediate area in which Plaintiff lives, or whether a specific job vacancy exists, or whether Plaintiff would be hired if he or she applied.  42 U.S.C. § 423(d)(2)(A).

At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

> (1)  If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.
>
> (2)  If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.

32

(3)  If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[14] or its equivalent.  If a listing is met or equaled, benefits are owing without further inquiry.

(4)  If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations).  By showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.

(5)  Once the claimant establishes a *prima facie* case of disability, the burden shifts to the Commissioner to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

20 C.F.R. §§ 404.1520, 416.920 (footnote added).  *See also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be satisfied by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule.  Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability determination.  *Id.*  In such cases where the grid does not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert testimony.  *See Varley v. Secretary*, 820 F.2d 777, 779 (6th Cir. 1987).

---

[14]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, App. 1.

33

In determining residual functional capacity for purposes of the analysis required at stages four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments; mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. § 423(d)(2)(B).

### C.  Plaintiff's Statement Of Errors

Plaintiff contends that the ALJ erred in (1) finding that she could return to her past relevant work because the VE erred in classifying Plaintiff's past relevant work as sedentary,[15] and (2) failing to find Plaintiff's subjective complaints of pain and fatigue fully credible. Docket Entry No. 9, TR 22.  Accordingly, Plaintiff maintains that, pursuant to 42 U.S.C. § 405(g), the Commissioner's decision should be reversed or, in the alternative, remanded. Docket Entry No. 9.

Sentence four of § 405(g) states as follows:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.

42 U.S.C. §§ 405(g), 1383(c)(3).

"In cases where there is an adequate record, the Secretary's decision denying benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985).  Furthermore, a court can reverse the decision and immediately award benefits if all essential factual issues have been resolved and the record

---

[15] Plaintiff further contends that, because she is unable to do her past work, Grid Rules 201.06 and 201.14 direct a finding of disability. Docket Entry No. 9.

34

adequately establishes a plaintiff's entitlement to benefits. *Faucher v. Secretary*, 17 F.3d 171, 176 (6th Cir. 1994). *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (1994).

## 1. VE's Classification of Plaintiff's Past Relevant Work

Plaintiff argues that the VE's classification of her past relevant work as sedentary was erroneous and that the ALJ, therefore, could not properly rely on the VE's testimony in determining that Plaintiff could return to her past relevant work. Docket Entry No. 9.

The VE classified Plaintiff's past relevant work as a parts inspector as sedentary because "the majority of the day was spent sitting down and the items being handled [were] much less than ten pounds." TR 509. Plaintiff maintains that her past relevant work as a parts inspector is more properly classified as light and cites the *Dictionary of Occupational Titles* as stating that a classification of light is appropriate "even though the weight lifted may be negligible" when the job involves "working at a production rate pace entailing the constant pushing and/or pulling of materials." *Id.*

Plaintiff's citation to the *Dictionary of Occupational Titles* is inapposite because her past relevant work experience as a parts inspector did not involve "constant pushing and/or pulling." Plaintiff testified that her job duties as a parts inspector involved repetitive inspection and loading of light bulbs. TR 508-509. She never testified that her job required any pushing and/or pulling. *Id.*

Plaintiff also argues that, although the majority of her job involved lifting objects weighing less than ten pounds, her "duties required lifting over 25 pounds three or four times per shift." Docket Entry No. 9. Plaintiff reported, in a Work History Report dated December 15, 2001, however, that the heaviest weight she lifted in that job was less than ten pounds. TR 86. She also

35

reported, "the bulbs ran down a line into an oven into a pan either myself *or someone* would have to carry." *Id.* (Emphasis added.)

Because Plaintiff's past relevant work as a parts inspector primarily involved sitting and handling objects weighing less than ten pounds, and did not entail "constant pushing and/or pulling of materials," the VE's classification of that work as sedentary was proper. Because the VE properly characterized Plaintiff's past relevant work, the ALJ was entitled to rely on the VE's opinion that Plaintiff was not precluded from returning to her past relevant work. Plaintiff's argument fails.

**2.  Subjective Complaints of Pain and Fatigue**

Plaintiff contends that the ALJ erred in finding that her subjective complaints of pain and fatigue were not fully credible because they were "not supported by the objective medical evidence." Docket Entry No. 9. Specifically, Plaintiff argues that her treating physicians have diagnosed her with fibromyalgia, which is "a condition characterized by the absence of objective findings." *Id.* As support for her subjective complaints, Plaintiff notes her testimony regarding a "restricted range of daily activities," and Dr. Tolbert's August 13, 2003 letter which states that Plaintiff experiences "significant limitations from fatigue," and which opines that her pain would hinder "doing any long-term tasks." *Id.*

The Sixth Circuit has set forth the following criteria for assessing a plaintiff's allegations of pain:

> [S]ubjective allegations of disabling symptoms, including pain, cannot alone support a finding of disability...[T]here must be evidence of an underlying medical condition *and* (1) there must be objective medical evidence to confirm the severity of the alleged pain arising from the condition *or* (2) the objectively determined medical condition must be of a severity which can reasonably be expected to

36

give rise to the alleged pain.

*Duncan v. Secretary*, 801 F.2d 847, 853 (6th Cir. 1986) (*quoting* S. Rep. No. 466, 98th Cong., 2d Sess. 24) (Emphasis added); *see also* 20 C.F.R. §§ 404.1529, 416.929 ("[S]tatements about your pain or other symptoms will not alone establish that you are disabled...."); and *Moon v. Sullivan*, 923 F.2d 1175, 1182-83 ("[T]hough Moon alleges fully disabling and debilitating symptomology, the ALJ, may distrust a claimant's allegations...if the subjective allegations, the ALJ's personal observations, and the objective medical evidence contradict each other.").  Moreover, "allegations of pain...do not constitute a disability unless the pain is of such a debilitating degree that it prevents an individual from engaging in substantial gainful activity."  *Bradley v. Secretary*, 862 F.2d 1224, 1227 (6th Cir. 1988).

When analyzing the claimant's subjective complaints of pain, the ALJ must also consider the following factors and how they relate to the medical and other evidence in the record: the claimant's daily activities; the location, duration, frequency and intensity of claimant's pain; the precipitating and aggravating factors; the type, dosage and effect of medication; and the other treatment or measures to relieve pain.  *See Felisky v. Bowen*, 35 F.3d 1027, 1039 (6th Cir. 1994) (*construing* 20 C.F.R. § 404.1529(c)(2)).  After evaluating these factors in conjunction with the evidence in the record, and by making personal observations of the claimant at the hearing, an ALJ may determine that a claimant's subjective complaints of pain and other disabling symptoms are not credible.  *See, e.g., Walters v. Commissioner,* 127 F.3d 525, 531 (6th Cir. 1997); *Blacha v. Secretary*, 927 F.2d 228, 230 (6th Cir. 1990); and *Kirk v. Secretary,* 667 F.2d 524, 538 (6th Cir. 1981).

In the instant case, the ALJ found that Plaintiff's "subjective allegations of disabling pain and functional limitations are not credible" because "they are not supported by the objective medical

37

evidence." TR 20. Specifically, the ALJ discussed, *inter alia*, that multiple doctors reported that Plaintiff's symptoms were well-controlled when she was properly medicated; that Plaintiff's "medications have been fairly consistent over time" with no reported side effects, except drowsiness from muscle relaxants; that Plaintiff reported "good results" from massage therapy; that several doctors' findings were consistent with a residual functional capacity to perform sedentary work; and that Plaintiff testified to doing "laundry, dusting, grocery shopping, going to church, driving, scrap booking, and reading." TR 19-22. The ALJ's decision specifically addresses in detail not only the medical evidence, but also Plaintiff's testimony and her subjective claims, clearly indicating that these factors were considered. *Id.* The ALJ's decision also properly discusses Plaintiff's "activities; the location, duration, frequency and intensity of claimant's pain; the precipitating and aggravating factors; the type, dosage and effect of medication; and the other treatment or measures to relieve pain." *Felisky*, 35 F.3d at 1039 (*construing* 20 C.F.R. § 404.1529(c)(2)). It is clear from the ALJ's detailed articulated rationale that, although there is evidence which could support Plaintiff's claims, the ALJ chose to rely on medical findings that were not supportive of Plaintiff's subjective allegations of her pain. This is within the ALJ's province.

The ALJ, when evaluating the entirety of the evidence, is entitled to weigh the objective medical evidence against Plaintiff's subjective claims of pain and reach a credibility determination. *See, e.g., Walters,* 127 F.3d at 531; and *Kirk v. Secretary,* 667 F.2d 524, 538 (6th Cir. 1981). An ALJ's findings regarding a claimant's credibility are to be accorded great weight and deference, particularly because the ALJ is charged with the duty of observing the claimant's demeanor and credibility. *Walters,* 127 F.3d at 531 (*citing Villarreal v. Secretary,* 818 F.2d 461, 463 (6th Cir. 1987)). Discounting credibility is appropriate when the ALJ finds contradictions among the medical

reports, the claimant's testimony, the claimant's daily activities, and other evidence. *See Walters*,

127 F.3d at 531 (*citing Bradley,* 682 F.2d at 1227; *cf King v. Heckler*, 742 F.2d 968, 974-75 (6th Cir.

1984); and *Siterlet v. Secretary*, 823 F.2d 918, 921 (6th Cir. 1987)). If the ALJ rejects a claimant's

testimony as not credible, however, the ALJ must clearly state the reasons for discounting a

claimant's testimony (*see Felisky*, 35 F.3d at 1036), and the reasons must be supported by the record

(*see King*, 742 F.2d at 975).

After assessing all the objective medical evidence, the ALJ determined that Plaintiff's

"allegations regarding her limitations are not totally credible." TR 22. As has been noted, this

determination is within the ALJ's province.

The ALJ observed Plaintiff during her hearing, assessed the medical records, and reached

a reasoned decision; the ALJ's findings are supported by substantial evidence and the decision not

to accord full credibility to Plaintiff's allegations was proper. Therefore, this claim fails.

## IV.  RECOMMENDATION

For the reasons discussed above, the undersigned recommends that Plaintiff's Motion for

Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner be

AFFIRMED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has ten (10) days from

receipt of this Report and Recommendation in which to file any written objections to it with the

District Court. Any party opposing said objections shall have ten (10) days from receipt of any

objections filed in which to file any responses to said objections. Failure to file specific objections

within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further

appeal of this Recommendation. *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied,* 474 U.S. 1111 (1986).

_____
E. CLIFTON KNOWLES
United States Magistrate Judge